**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| GINGER MOUNCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19CV434 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Ginger Mounce, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 15; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 16 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging disability onset dates of December 31, 2010, and March 1, 1994, respectively. (Tr. 260-66, 267-72.)  Upon denial of those applications initially (Tr. 97-134, 177-81) and on reconsideration (Tr. 135-76, 190-200), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 202-03).  Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing (Tr. 50-96), during which Plaintiff amended her onset date to coincide with her date last insured of March 31, 2015 (see Tr. 22, 24, 64).  The ALJ subsequently determined that Plaintiff did not qualify as disabled under the Act. (Tr. 19-37.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 256-57, 392-94), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings:

1.  [Plaintiff] meets the insured status requirements of the . . . Act through March 31, 2015.

2.  [Plaintiff] has not engaged in substantial gainful activity since March 31, 2015, the alleged onset date.

. . .

3.  [Plaintiff] has the following severe impairments: bilateral knee degenerative joint disease; degenerative

joint disease of the bilateral wrists and thumbs; L4-L5
disc protrusion with stenosis; coronary artery disease
with stents; anxiety; depression; bipolar disorder; and
attention deficit hyperactivity disorder.

. . .

4. [Plaintiff] does not have an impairment or
combination of impairments that meets or medically
equals the severity of one of the listed impairments in
20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [Plaintiff] has the residual functional
capacity to perform light work . . . except she can
occasionally engage in balancing, stooping, kneeling,
crouching, crawling, using foot pedals, and climbing
stairs and ramps, but cannot climb ropes, ladders, or
scaffolds. She can perform frequent handling and
fingering. [She] should avoid concentrated exposure to
hazards. She can perform simple, routine, repetitive
tasks and can handle routine changes to her work setting.

. . .

6. [Plaintiff] is not capable of performing her past
relevant work.

. . .

10. Considering [Plaintiff's] age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [Plaintiff] can perform.

. . .

11.  [Plaintiff] has not been under a disability, as
defined in the . . . Act, from March 31, 2015, through
the date of this decision.

(Tr. 24-37 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social
Security Commissioner's denial of social security benefits."
Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However,
"the scope of . . . review of [such a] decision . . . is extremely
limited."  Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).
Plaintiff has not established entitlement to relief under the
extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).  Instead,
"a reviewing court must uphold the factual findings of the ALJ
[underlying the denial of benefits] if they are supported by
substantial evidence and were reached through application of the
correct legal standard."  Hines, 453 F.3d at 561 (internal brackets
and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting

4

Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving

a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981),
and that, in this context, "disability" means the "'inability to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months,'" <u>id.</u>
(quoting 42 U.S.C. § 423(d)(1)(A)).[2]  "To regularize the
adjudicative process, the Social Security Administration [('SSA')]
has . . . promulgated . . . detailed regulations incorporating
longstanding medical-vocational evaluation policies that take into
account a claimant's age, education, and work experience in
addition to [the claimant's] medical condition."  <u>Id.</u>  "These
regulations establish a 'sequential evaluation process' to
determine whether a claimant is disabled." <u>Id.</u> (internal citations
omitted).

This sequential evaluation process ("SEP") has up to five
steps:  "The claimant (1) must not be engaged in 'substantial
gainful activity,' i.e., currently working; and (2) must have a
'severe' impairment that (3) meets or exceeds the 'listings' of
specified impairments, or is otherwise incapacitating to the

---

[2] The Act "comprises two disability benefits programs.  [DIB] . . . provides
benefits to disabled persons who have contributed to the program while employed.
[SSI] . . . provides benefits to indigent disabled persons.  The statutory
definitions and the regulations . . . for determining disability governing these
two programs are, in all aspects relevant here, substantively identical."
<u>Craig</u>, 76 F.3d at 589 n.1 (internal citations omitted).

extent that the claimant does not possess the residual functional
capacity to (4) perform [the claimant's] past work or (5) any other
work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d
473, 475 n.2 (4th Cir. 1999).[3]  A finding adverse to the claimant
at any of several points in the SEP forecloses an award and ends
the inquiry.  For example, "[t]he first step determines whether
the claimant is engaged in 'substantial gainful activity.' If the
claimant is working, benefits are denied.  The second step
determines if the claimant is 'severely' disabled.  If not,
benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th
Cir. 1990).

On the other hand, if a claimant carries his or her burden at
each of the first three steps, "the claimant is disabled." Mastro,
270 F.3d at 177.  Alternatively, if a claimant clears steps one
and two, but falters at step three, i.e., "[i]f a claimant's
impairment is not sufficiently severe to equal or exceed a listed
impairment, the ALJ must assess the claimant's residual functional
capacity ('RFC')." Id. at 179.[4]  Step four then requires the ALJ

---

[3] "Through the fourth step, the burden of production and proof is on the
claimant.  If the claimant reaches step five, the burden shifts to the
[government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's]
limitations." Hines, 453 F.3d at 562 (noting that administrative regulations
require RFC to reflect claimant's "ability to do sustained work-related physical
and mental activities in a work setting on a regular and continuing basis . . .
[which] means 8 hours a day, for 5 days a week, or an equivalent work schedule"
(internal emphasis and quotation marks omitted)).  The RFC includes both a
"physical exertional or strength limitation" that assesses the claimant's

to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to identify and obtain and [sic] reasonable explanation for the apparent conflict between the

---

"ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

testimony of the VE and the [Dictionary of Occupational Titles ('DOT')] regarding the reasoning requirements of the jobs cited at Step Five of the SEP" (Docket Entry 13 at 4 (bold font and single-spacing omitted));

2) "[t]he ALJ failed to form a logical bridge between the evidence of Plaintiff's [degenerative joint disease ('DJD')] of the bilateral wrists and thumbs and her ability to use her hands in the RFC" (id. at 7 (bold font and single-spacing omitted));

3) "[t]he ALJ did not factor in all the relevant evidence when assessing Plaintiff's functional limitations due to lumbar stenosis with radiculopathy and bilateral knee DJD" (id. at 10 (bold font and single-spacing omitted)); and

4) "[t]he ALJ erred in her evaluation of Plaintiff's [activities of daily living ('ADLs')]" (id. at 17 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmation of the ALJ's decision. (See Docket Entry 16 at 8-25.)

## 1. Conflict between VE and DOT

In Plaintiff's first assignment of error, she contends that "[t]he ALJ erred by failing to identify and obtain and [sic] reasonable explanation for the apparent conflict between the testimony of the VE and the [DOT] regarding the reasoning requirements of the jobs cited at Step Five of the SEP." (Docket

Entry 13 at 4 (bold font and single-spacing omitted).) More
specifically, Plaintiff asserts that all three of the jobs cited
by the VE and relied upon by the ALJ at step five of the SEP, i.e.,
Office Helper, Assembler, and Inspector Checker, "require a
[R]easoning [Development L]evel [('RDL')] of '2'" (id. at 5 (citing
DOT, No. 239.567-010 ("Office Helper"), 1991 WL 672232 (G.P.O. 4th
ed. rev. 1991), DOT, No. 729.684-054 ("Subassembler"), 1991 WL
679729, and DOT, No. 222.687-042 ("Inspector, Handbag Frames"),
1991 WL 672138)), which "requires an individual to be capable of
'carry[ing] out detailed but uninvolved written or oral
instructions[, and d]eal[ing] with problems involving a few
concrete variables in or from standardized situations'" (id.
(citing DOT, App'x C ("Components of the Definition Trailer"),
§ III ("General Educational Development"), 1991 WL 688702)).

According to Plaintiff, "an apparent conflict [exists]
between the VE's testimony that [Plaintiff] could perform the[]
jobs [in question] with a restriction to simple tasks and the
[DOT's] requirement of carrying out detailed tasks." (Id.; see
also id. at 6 ("'[T]he conflict between [the plaintiff's]
limitation to short, simple instructions and the VE's testimony
that [the plaintiff] could perform jobs that include detailed but
uninvolved instructions is as apparent as the conflict we
identified in [Pearson v. Colvin, 810 F.3d 204, 208-09 (4th Cir.

2015)]'" (quoting Thomas v. Berryhill, 916 F.3d 307, 314 (4th Cir. 2019))).)  Plaintiff's argument fails because, less than a month after Plaintiff filed her instant Motion, the United States Court of Appeals for the Fourth Circuit decided Lawrence v. Saul, 941 F.3d 140 (4th Cir. 2019), and therein held that no inconsistency existed between the plaintiff's RFC limiting him to "simple, routine[,] repetitive tasks [('SRRTs')]" and "[RDL] 2's notions of 'detailed but uninvolved . . . instructions and tasks with "a few[] variables.'"  Lawrence, 941 F.3d at 143 (quoting DOT, App'x C, 1991 WL 688702).  The Fourth Circuit distinguished its earlier decision in Thomas by explaining that "the key difference is that [the plaintiff in Thomas] was limited to 'short' instructions[, which] is inconsistent with 'detailed' because detail and length are highly correlated."  Id. (emphasis added).  The court further pointed out that "[i]nstructions often include many steps, each of which is straightforward," noting that "[d]riving directions are a good example: they may prescribe many turns, but the turns are generally easy to make, and the route rarely changes, making the directions simple, routine, and repetitive."  Id.

In short, as Plaintiff's RFC here limits her to SRRTs, and not short instructions, no conflict between the VE and DOT existed under the controlling authority of Lawrence.  Plaintiff's first assignment of error thus lacks merit.

## 2. Bilateral Wrist and Thumb DJD

In her second assignment of error, Plaintiff argues that "[t]he ALJ failed to form a logical bridge between the evidence of Plaintiff's DJD of the bilateral wrists and thumbs and her ability to use her hands in the RFC." (Docket Entry 13 at 7 (bold font and single-spacing omitted).) According to Plaintiff, "'meaningful review is frustrated when an ALJ goes straight from listing the evidence to stating a conclusion,'" and that "'a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion.'" (Id. at 8 (quoting Thomas, 916 F.3d at 311).) In that regard, Plaintiff argues that "[m]eaningful review is precluded here as after concluding that [Plaintiff] c[ould] use her hands frequently for handling and fingering and lift and carry up to 20 pounds, the ALJ d[id] not then go on to explain how the evidence support[ed] th[at] conclusion." (Id. at 9.) Plaintiff deems this error by the ALJ "harmful," because Plaintiff "testified that . . . she could not hold onto and carry anything of significant weight (even a bag of groceries)" (id. (citing Tr. 83)) and, if the ALJ limited Plaintiff to sedentary work, Rule 201.14 of the Medical-Vocational Guidelines would direct a conclusion of "disabled" (id. (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.14)). Plaintiff's contentions fail to establish an entitlement to relief for three reasons.

First, the ALJ expressly acknowledged Plaintiff's complaints of wrist and thumb pain and stiffness during his discussion of the medical evidence:

> . . . [Plaintiff] testified that she . . . has tendonitis in both wrists, worse on the right. She uses a brace on her right wrist that helps some, but she cannot move her wrists, and she has pain there all the time. She also cannot grip things well with her right dominant hand, and often needs assistance opening jars and turning door knobs. . . . She can lift up to 40 pounds, but not frequently, not every day, and only lifts small things at home.

(Tr. 30.) After considering that testimony, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (Id.) For the reasons discussed in more detail in connection with Plaintiff's fourth issue on review, the ALJ supported her analysis of Plaintiff's subjective reports of pain with substantial evidence.

Second, the ALJ sufficiently discussed the objective findings in the medical evidence regarding Plaintiff's wrist and thumb DJD. At step two of the SEP, the ALJ noted that Plaintiff "underwent MRIs on both wrists" which showed "moderate wrist joint degenerative changes with joint effusion, scattered cysts, and degenerative changes involving the thumb[s]." (Tr. 26 (citing Tr. 581-85).) On the basis of those MRIs, the ALJ found Plaintiff's

DJD of the bilateral wrists and thumbs a severe impairment. (See Tr. 25.) Proceeding on to step three, the ALJ found that Plaintiff's wrist and thumb DJD did not meet or medically equal the criteria of Listing 1.02B. (See Tr. 27.) Significantly, the ALJ noted that, although "diagnostic imaging show[ed] the presence of osteoarthritis in both [Plaintiff's] wrists and thumbs[, ] there [wa]s little, if any, medical evidence of [Plaintiff] making significant complaints of wrist pain, or of her describing functional difficulties associated with these impairments, let alone of such severity as to preclude effective performance of fine and gross movements." (Id. (internal citation omitted).)

Indeed, the record contains only two office visits documenting complaints of wrist pain (see Tr. 627 (10/12/16 treatment note with primary care physician ("PCP") reflecting Plaintiff's complaint of bilateral radial wrist pain since "1998/1999"[6] and use of braces which "help[ed] a little" (emphasis added)), 633 (office visit of 10/27/16 noting Plaintiff had worsening pain in dorsal-radial wrist with mild swelling)), both

---

[6] Notably, Plaintiff's testimony and Work History Report reflects that she worked as a warranty clerk, service writer, machine operator, newspaper carrier, document preparer, housekeeper, furniture assembler, food sample attendant, and cashier since 1998, despite her complaints of bilateral radial wrist pain since 1998/1999. (See Tr. 57-62, 329.)

of which lacked particularized examinations of Plaintiff's wrists and/or thumbs (see Tr. 630, 635).[7]

Third, the ALJ accorded "little weight" to the opinions of the state agency medical consultants (Tr. 34), who each limited Plaintiff to a full range of medium work without any manipulative limitations (see Tr. 106, 124, 146, 166), observing that "evidence presented at the hearing level, including objective imagery testing pertaining to [Plaintiff's] lower back, wrist[s], and bilateral knees, demonstrates greater number and severity of impairments" (Tr. 34 (emphasis added)).  The ALJ accordingly included limitations to light work, i.e., lifting and carrying of no more than 20 pounds occasionally and 10 pounds frequently, see 20 C.F.R. § 404.1567(b), 416.967(b), as well as frequent handling and fingering in the RFC (see Tr. 29-30), which clearly captured Plaintiff's complaints of wrist and thumb pain and stiffness to the extent the ALJ found those complaints consistent with the record.

In sum, the ALJ's discussion of the evidence relating to Plaintiff's wrist and thumb impairment provides "an accurate and

_____

[7] Plaintiff relies upon two office visits with Piedmont Orthopedics in October and November of 2017 to support her argument that the ALJ failed to connect her discussion of Plaintiff's wrist/thumb impairment to the RFC findings (see Docket Entry 13 at 9-10); however, the ALJ did not assess that evidence, because Plaintiff submitted it to the Appeals Council after the ALJ's unfavorable decision (see Tr. 2, 43-49).

logical bridge," <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000), to the RFC that allows for meaningful judicial review. As such, Plaintiff's second assignment of error fails as a matter of law.

### 3. Back and Knee Impairments

Next, Plaintiff maintains that "[t]he ALJ did not factor in all the relevant evidence when assessing Plaintiff's functional limitations due to lumbar stenosis with radiculopathy and bilateral knee DJD." (Docket Entry 13 at 10 (bold font and single-spacing omitted).) In particular, Plaintiff implies that the ALJ overlooked Plaintiff's testimony regarding her back and knee impairments (<u>see</u> <u>id.</u> at 10-11 (citing Tr. 67, 75, 76, 82, 92-93)), "summarized some of the evidence in the file[,] and made a series of statements which were aimed at undercutting the credibility of [Plaintiff's] testimony generally" (<u>id.</u> at 11 (citing Tr. 30-32)). According to Plaintiff, "[t]he ALJ's statements [regarding Plaintiff's credibility] do not constitute a proper function[-]by[-]function analysis" of her ability to engage in work-related activities as required by <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015). (Docket Entry 13 at 11 (citing <u>Green v. Berryhill</u>, No. 1:15CV273, 2017 WL 1206014, at *7 (W.D.N.C. Mar. 30, 2017) (unpublished).) Plaintiff additionally asserts that the ALJ "misconstrue[d] the evidence" (<u>id.</u> at 12) and "took [some doctors']

16

statement[s] out of context" (id. at 13).  Those arguments fall
short.

     "The RFC assessment must first identify the individual's
functional limitations or restrictions and assess his or her work-
related abilities on a function-by-function basis . . . .  Only
after that may RFC be expressed in terms of the exertional levels
of work, sedentary, light, medium, heavy, and very heavy."  Social
Security Ruling 96-8p, Policy Interpretation Ruling Titles II and
XVI: Assessing Residual Functional Capacity in Initial Claims,
1996 WL 374184, at *1 (July 2, 1996) ("SSR 96-8p").  In Mascio,
the Fourth Circuit held that, where an ALJ fails to complete a
function-by-function analysis, "a per se rule is inappropriate
given that remand would prove futile in cases where the ALJ does
not discuss functions that are irrelevant or uncontested," Mascio,
780 F.3d at 636, but that "'remand may be appropriate where an ALJ
fails to assess a claimant's capacity to perform relevant
functions, despite contradictory evidence in the record, or where
other inadequacies in the ALJ's analysis frustrate meaningful
review,'" id. (internal brackets and ellipsis omitted) (quoting
Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

     Contrary to Plaintiff's suggestion, the ALJ explicitly
addressed Plaintiff's statements regarding her back and knee pain,
as well as assessed her abilities to lift, carry, sit, stand, and

walk.  At step three of the SEP, in determining that Plaintiff's

L4-L5 disc protrusion with stenosis did not meet or medically equal

the criteria of Listings 1.02A or 1.04, the ALJ stated:

> . . . [Plaintiff] reported to treating and examining
> physicians that she has difficulties walking further
> than one and a half blocks in distance, has difficulties
> walking up and down stairs, and cannot stay on her feet
> for prolonged time.

(Tr. 27 (internal citation omitted); see also Tr. 30 (noting

Plaintiff's testimony that "[s]he can lift up to 40 pounds, but

not frequently, not every day, and only lifts small things at

home").)  The ALJ later discussed Plaintiff's testimony as to her

knee DJD and its impact on her functioning:

> . . . [Plaintiff] testified that she experiences varying
> knee pain every day and that, while she takes pain
> medications every day, her pain requires her to get up
> and walk. . . .  She reported that she can sit[] for 45
> minutes, stand for 8 minutes but has to move around, and
> can walk half a mile in 10 minutes.

(Tr. 30.)  However, as noted above, the ALJ ultimately determined

that Plaintiff's "statements concerning the intensity, persistence

and limiting effects of [her] symptoms [we]re not entirely

consistent with the medical evidence and other evidence in the

record."  (Id.)

Plaintiff acknowledges that the ALJ thereafter provided

several reasons to support her determination that Plaintiff's

subjective complaints lacked consistency with the overall record.

(Docket Entry 13 at 11.)  Plaintiff insists, however, that the

18

ALJ's "credibility" findings do not substitute for the function-by-function analysis required by Mascio. (Id. (citing Green, 2017 WL 1206014, at *7).)

As an initial matter, Plaintiff's reliance on Green falls short, in part, because ALJs no longer conduct "credibility" analyses when evaluating claimants' subjective symptom reports. See Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *1 (Oct. 25, 2017) ("SSR 16-3p") (applicable to ALJ decisions on or after March 28, 2016, "eliminating the use of the term 'credibility' from [the SSA's] sub-regulatory policy," and "clarify[ing] that subjective symptom evaluation is not an examination of an individual's character"). Thus, Green's holding that "[t]he ALJ's reliance on medical evidence and [the plaintiff's] ADLs [wa]s sufficiently clear to explain a lesser credibility finding for [the p]laintiff and her physicians, but . . . d[id] not alone provide a clear logical connection for why the ALJ concluded that [the p]laintiff can perform the exertional functions of light work," Green, 2017 WL 1206014, at *7 (emphasis added), should not guide the Court's analysis here.

Moreover, SSR 16-3p makes clear that an ALJ must "evaluate the intensity and persistence of an individual's symptoms so [the ALJ] can determine how symptoms limit [the individual's] ability

19

to perform work-related activities," SSR 16-3p, 2017 WL 5180304, at *1 (emphasis added). Thus, although an analysis of the consistency of a claimant's subjective complaints with the overall record might not, standing alone, suffice to provide substantial evidence to support an ALJ's RFC finding, such an analysis nonetheless forms a critical part of the RFC determination. In this case, as explained in more detail below, the ALJ relied on much more than her analysis of the consistency of Plaintiff's subjective complaints to support the RFC determination.

Beyond the no-longer-applicable context of "credibility" analyses, Green's facts also distinguish it from the instant case. In Green, the ALJ accorded little weight to both of Plaintiff's treating physicians, Plaintiff's own testimony, as well as the statements of Plaintiff's husband and parents, all of whom opined that Plaintiff could not sit, stand, and/or walk for long periods of time. Green, 2017 WL 1206014, at *7. Thus, "the [c]ourt [wa]s left guessing" as to how the ALJ determined the plaintiff could perform the "'good deal of walking or standing,'" required by light work. Id. (quoting 20 C.F.R. §§ 404.1576(b), 416,967(b)).

In contrast, here, none of Plaintiff's treating physicians offered opinions regarding Plaintiff's ability to sit, stand, and/or walk and, on a Third Party Function Report, Plaintiff's sister merely indicated that Plaintiff's conditions affected

20

"[s]tanding" in an unspecified way, that such conditions did not affect "[w]alking" or "[s]itting," and that she "d[id not] know" how long Plaintiff could walk before needing to stop and rest (Tr. 326). Thus, unlike in Green, the ALJ here did not disregard five different opinions that Plaintiff remained unable to perform the standing and walking requirements of light work.

Moreover, the ALJ accorded "little weight" to the opinions of the state agency medical consultants (Tr. 34), who each opined that Plaintiff remained capable of performing a full range of medium work without any postural limitations (see Tr. 106, 124, 146, 166), finding that "evidence presented at the hearing level, including objective imagery testing pertaining to [Plaintiff's] lower back, wrist[s], and bilateral knees, demonstrate[d] greater number and severity of impairments" (Tr. 34 (emphasis added)). Correspondingly, the ALJ restricted Plaintiff to light work, i.e., lifting and carrying of no more than 20 pounds occasionally and 10 pounds frequently, see 20 C.F.R. § 404.1567(b), 416.967(b), as well as to only occasional balancing, stooping, kneeling, crouching, crawling, using of foot pedals, and climbing of ramps and stairs, and no climbing of ladders, ropes, or scaffolds in the RFC (see Tr. 29-30). Those limitations accommodated Plaintiff's subjective reports of back and knee pain insofar as the ALJ deemed them consistent with the evidence. As a result, unlike in Green,

the Court can trace the path of the ALJ's reasoning regarding Plaintiff's abilities to lift, carry, sit, stand, and walk in this case.

Plaintiff additionally maintains that the ALJ misconstrued the evidence regarding Plaintiff's back and knee impairments and/or interpreted it out of context. (Docket Entry 13 at 12-13.) Plaintiff first faults the ALJ for relying on the statement of Dr. Sara L. Neal with Cone Health Sports Medicine that the source of Plaintiff's intense knee pain remained "[u]nclear" given the results of bilateral knee MRIs showing "mostly degenerative meniscal issues[ and] one small posterior horn tear" (Tr. 539). (Docket Entry 13 at 12.) According to Plaintiff, on the same date, Dr. Neal's resident, Dr. Alexander J. Karamalegos, diagnosed "tricompartmental cartilage degenerative changes with 'severe' medial femorotibial compartment degeneration and moderate joint effusion." (Id. (referencing Tr. 31 and quoting Tr. 541).) Plaintiff further points out that, "[a] few days later, Dr. [Michael D.] Rigby of [Piedmont Orthopedics] recorded that [Plaintiff] was experiencing 'severe debilitating pain' and that he believed she no doubt had an underlying knee pathology but he was concerned it was being compounded by an underlying radicular component from her lower back." (Id. (quoting Tr. 639).)

Contrary to Plaintiff's allegations, the quoted language from Drs. Karamalegos and Rigby does not demonstrate that the ALJ misconstrued Dr. Neal's statement or interpreted it out of context. As an initial matter, prior to the statement regarding Dr. Neal's lack of clarity as to the source of Plaintiff's knee pain, Dr. Neal stated that she "ha[d] discussed [Plaintiff] with [Dr. Karamalegos] and reviewed [his] assessment and plan," and that she "agree[d] with [Dr. Karamalegos's] findings and plan." (Tr. 539.) Thus, the ALJ had no reason to view Dr. Karamalegos's findings as in any way inconsistent with Dr. Neal's statement. Furthermore, the ALJ found Plaintiff's bilateral knee DJD a severe impairment at step two of the SEP, expressly acknowledging that MRIs of Plaintiff's knees showed "meniscus tears, tricompartmental cartilage abnormalities, and joint effusion . . . , more severe on the right." (Tr. 26.) Notably, Dr. Rigby's report actually supports Dr. Neal's statement, because Dr. Rigby opined that Plaintiff's knee DJD and meniscal tears could not entirely explain Plaintiff's complaints of "severe debilitating pain," and that he suspected that "underlying radicular" symptoms played a role. (Tr. 639.)

In addition, Plaintiff contends that the ALJ "dismissed [Plaintiff's] complaints of severe, worsening [lower back pain,] . . . describing her degeneration of the lumbar spine as "mild."

(Docket Entry 13 at 12 (purportedly quoting Tr. 32).) In that regard, Plaintiff points to her lumbar MRI which showed "disc bulging at the L4-5 level which was so severe it compressed her right L5 nerve," as well as the "potential for left L5 nerve root impingement [and] displacement of the descending S1 nerve root on the left due to L5-S1 [disc] protrusion and annular fissuring." (Id. (citing Tr. 588).)

To begin, the ALJ did not "describe[e Plaintiff's] degeneration of the lumbar spine as 'mild'" (id.); rather, the ALJ discussed Plaintiff's visit to Piedmont Orthopedics on January 24, 2017, and recited nearly verbatim Dr. Rigby's interpretation of lumbar spine x-rays as showing "minimal degenerative facet and degenerative disc disease, well-aligned with no significant scoliosis." (Tr. 32 (emphasis added) (referencing Tr. 639).) Moreover, at step two of the SEP, the ALJ discussed Plaintiff's treatment for back pain from 2015 to 2017 and noted, in connection with finding Plaintiff's L4-L5 disc protrusion with stenosis a severe impairment, that Plaintiff's lumbar MRI evidenced "a[n] L4-L5 disc protrusion with right more than left subarticular recess stenosis and right L5 compression and severe arthropathy on the left." (Tr. 25 (emphasis added).) Plaintiff simply has not shown the ALJ misconstrued or misinterpreted the evidence relating to Plaintiff's back impairment.

Next, Plaintiff challenges the ALJ's reliance upon "Dr. [G. Scott] Dean's statement from February 8, 2017 that 'I think arthroscopy is not going to be a great option for [Plaintiff]' as evidence that her condition was not as severe as alleged." (Docket Entry 13 at 12-13 (internal citation omitted) (referencing Tr. 31 and quoting Tr. 638).) Plaintiff points out that Dr. Dean did not view arthroscopy as a viable treatment for Plaintiff "'because of the amount of arthritis in her knees,'" but also felt that arthroscopy remained "'something to consider versus total knee replacement with Press-Fit components.'" (Id. at 13 (quoting Tr. 638).) Plaintiff's argument fails for the simple reason that the ALJ did not recite Dr. Dean's statement about arthroscopy "as evidence that [Plaintiff's] condition was not as severe as alleged" (id.). The ALJ's mention of Dr. Dean's statement occurred in a paragraph in which the ALJ summarized Plaintiff's treatments for knee pain generally and discussed objective findings both favorable and unfavorable to Plaintiff's claims of severe pain. (See Tr. 31.) The ALJ merely recited Dr. Dean's statement, noted his prescription of a six-week trial of narcotics, and commented on the absence of evidence in the record that Plaintiff "return[ed] following the six[-]week trial of prescription medications." (Id.)

Plaintiff also argues that "the ALJ's citation to [Plaintiff's] intact strength on [physical examinations] does not detract from [her] limitations due to *pain*." (Docket Entry 13 at 13 (emphasis in original) (referencing Tr. 32).) According to Plaintiff, "[t]he fact that a person has the motor strength to walk far does not mean that she can walk far if it is too painful to do so." (Id. (citing Watson v. Colvin, No. 5:14CV809, 2016 WL 319629, at *6 (E.D.N.C. Jan. 4, 2016) (unpublished)).)

The Watson case did not hold that findings of intact strength lack any relevance to an analysis of a claimant's pain; rather, the court held that, given that particular plaintiff's findings of "positive Tinel's sign[s,] . . . numbness, swelling, [] and decreased range of motion," the ALJ's near-exclusive reliance on Plaintiff's "5/5 strength bilaterally" at a consultative examination to discount her subjective complaints "d[id] not negate her pain allegations." Watson, 2016 WL 319629, at *6. Moreover, although the ALJ here did note that "[e]xaminations [of Plaintiff] revealed no . . . loss of strength," the ALJ also relied on the following other factors in her analysis of the intensity, persistence, and limiting effects of Plaintiff's knee pain:

- Plaintiff "regularly performs a number of household tasks, such as cleaning, cooking food, wash[ing] clothes, and . . . shopping" and lives with and provides some household assistance to an 80-year-old man (Tr. 32);

26

- Plaintiff's "treating and examining physicians, including multiple specialists in orthopedics and sports medicine, noted that the severity and type of [Plaintiff's] knee impairments did not adequately explain her complaints of severe knee pain" (id.);

- "[e]xaminations revealed no atrophy[] . . . or malalignment of the knee" (id.); and

- Plaintiff "did not follow through with ordered physical therapy, and there is little evidence that she took prescribed pain medications for more than a short time period, which was then followed by a significant gap in medical treatment" (id.).

For the reasons further discussed in conjunction with Plaintiff's fourth issue on review, the ALJ supported his analysis of Plaintiff's subjective reports of pain with substantial evidence.

Plaintiff further maintains that her "testimony enjoys considerable support from the record" (Docket Entry 13 at 14), and proceeds to discuss her subjective complaints and objective findings that she believes bolster her complaints of disabling pain (see id. at 14-17 (citing Tr. 397, 457, 467, 540, 541, 542, 543, 544, 546, 555, 557, 588, 590, 592, 630, 638, 639, 641, 642)). However, Plaintiff misinterprets this Court's standard of review. The Court must determine whether the ALJ based her determinations regarding Plaintiff's knee and back pain on substantial evidence, defined as "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), and not whether other record evidence weighs against the ALJ's analysis, Lanier v.

Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence."). As discussed above, the ALJ here buttressed her finding that, despite back and knee impairments, Plaintiff remained able to perform the lifting, carrying, sitting, standing, and walking of light work through her discussion of Plaintiff's treatment records, the opinion evidence, and Plaintiff's daily activities.

Simply put, Plaintiff's third assignment of error misses the mark.

### 4. ADLs

Lastly, Plaintiff argues that "[t]he ALJ erred in her evaluation of Plaintiff's ADLs." (Docket Entry 13 at 17 (bold font and single-spacing omitted).) In particular, Plaintiff faults the ALJ for failing to "explain how [Plaintiff's] minimal ADLs [we]re inconsistent with [her] testified limitations in walking, standing, lifting and use of her hands." (Id. at 17-18.) Plaintiff points out that the Fourth Circuit has held that "'[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them.'" (Id. at 18 (quoting Woods v. Berryhill, 888 F.3d 686, 694

28

(4th Cir. 2018) (emphasis supplied to match original), and citing
Lewis v. Berryhill, 858 F.3d 858, 868 n.3 (4th Cir. 2017), Brown
v. Commissioner Soc. Sec. Admin., 873 F.3d 251, 263 (4th Cir.
2017), Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981), and
Fletcher v. Colvin, No. 1:14CV380, 2015 WL 4506699, at *5-8
(M.D.N.C. July 23, 2015) (unpublished) (Webster, M.J.),
recommendation adopted, slip op. (M.D.N.C. Aug. 14, 2015) (Biggs,
J.)).)[8] Those contentions do not warrant relief.

SSR 16-3p (consistent with the Commissioner's regulations)
adopts a two-part test for evaluating a claimant's statements about
symptoms. See SSR 16-3p, 2017 WL 5180304, at *3; see also 20
C.F.R. §§ 404.1529, 416.929. First, the ALJ "must consider whether
there is an underlying medically determinable physical or mental
impairment(s) that could reasonably be expected to produce an
individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304,

---

[8] Plaintiff's reliance on Fletcher misses the mark. In that case, the ALJ had
found the plaintiff capable of medium work, see Fletcher, 2015 WL 4506699, at
*5, which involves lifting and carrying up to 50 pounds occasionally and 25
pounds frequently, see 20 C.F.R. §§ 404.1567(c), 416.967(c), amounts
significantly heavier than the 20 and ten pounds involved with light work, see
20 C.F.R. §§ 404.1567(b), 416.967(b). In Fletcher, the Court focused on the
fact that the daily activities relied upon by the ALJ did not demonstrate an
ability to perform the demanding requirements of medium work. See, e.g.,
Fletcher, 2015 WL 4506699, at *7 ("[T]he undersigned does not understand why
Plaintiff's ability to take . . . trips over a multi-year period — most of which
involved driving an hour and apparently remaining sedentary upon arrival — would
translate to an ability to repeatedly lift twenty-five to fifty pounds for a
considerable portion of the day or to stand for most of a work day."); see also
Tolbert v. Colvin, No. 1:15CV437, 2016 WL 6956629, at *6 n.5, *7-8 (M.D.N.C.
Nov. 28, 2016) (unpublished) (Osteen, Jr., C.J.) (deeming "[r]eliance on
Fletcher [] not justified," because ALJ found the plaintiff capable of medium
work, which involves "significantly heavier" lifting requirements than light
work).

at *3.  A claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms."  Id.  Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques."  Id.

Upon satisfaction of part one by the claimant, the analysis proceeds to part two, which requires an assessment of the intensity and persistence of the claimant's symptoms, as well as the extent to which those symptoms affect his or her ability to work.  See id. at *4.  In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Id.  Where relevant, the ALJ will also consider the following factors in assessing the extent of the claimant's symptoms at part two:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

Id. at *7-8. The ALJ cannot "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5 (emphasis added). When evaluating a claimant's subjective complaints about their symptoms, however, the ALJ need not take those complaints "'at face value.'" Squires v. Colvin, No. 1:16CV190, 2017 WL 354271, at *5 (M.D.N.C. Jan. 24, 2017) (unpublished) (quoting Ramos-Rodriguez v. Commissioner of Soc. Sec., Civ. No. 11-1323 (SEC), 2012 WL 2120027, at *3 (D.P.R. June 11, 2012) (unpublished)), recommendation adopted, slip op. (M.D.N.C. Mar. 6, 2017) (Schroeder, J.).

31

As discussed above, the ALJ in this case found at part one of the analysis that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but found at part two that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (Tr. 30.) The ALJ then provided the following analysis to support her part two finding:

> [Plaintiff] admitted that she regularly performs a number of household tasks, such as cleaning, cooking food, wash[ing] clothes, and go[ing] out shopping twice per week. She also testified that she lives with an older man who is "depressed and not sociable," but who she claimed "helped her out a whole lot." In therapy notes starting in July of 2015, [Plaintiff] reported that she was "in a complicated relationship with an older man due to financial problems" and expressed frustration with her needing to "try to care for [a] man who is almost 80" but that she has difficulties setting boundaries with him because "I am his life," and then later expressed anxiety about his leaving her to go on an extended trip. Based on a review of all evidence of record, it is reasonable to conclude that the "help" this older man provided was largely financial, and that in return she provided some household assistance, which she had told to her provider was primarily cooking.
>
> Additionally, Plaintiff's treating and examining physicians, including multiple specialists in orthopedics and sports medicine, noted that the severity and type of [Plaintiff's] knee impairments did not adequately explain her complaints of severe knee pain. Examinations revealed no atrophy, loss of strength, or malalignment of the knee. [Plaintiff] did not follow through with ordered physical therapy, and there is little evidence that she took prescribed pain

medications for more than a short time period, which was
then followed by a significant gap in medical treatment.

(Tr. 32 (internal citations omitted).)

The ALJ here did not overstate Plaintiff's daily activities.
The record contains varying statements from Plaintiff regarding
her ability to engage in daily activities.   On July 17, 2015,
Plaintiff completed a Function Report on which she indicated that
she cleaned her home and washed clothes once per week (see Tr.
337, 339), cooked "mostly complete meals" every day for 30 minutes
to two hours at a time, vacuumed, watered outside plants, washed
dishes every day (Tr. 339, 341), went outside six times per day,
drove a car, shopped for groceries three times per month for one
hour at a time (see 340), and attended church (but not every week)
(see Tr. 341).   At the hearing before the ALJ on September 15,
2017, Plaintiff testified that she no longer drove (because she
lost her driver's license after a speeding ticket) (see Tr. 56),
and that she cooked food, washed clothes, cleaned (but not "a whole
lot") (Tr. 77), went to the store "maybe twice in a month" (Tr.
78), visited with nearby friends (see id.), went walking sometimes,
and went to church once per week (see Tr. 79).

Given the differing statements from Plaintiff regarding both
the type and the frequency of daily activities she could perform,
the ALJ fulfilled her duty to weigh the conflicting evidence and
determine which of Plaintiff's statements most harmonized with the

33

record evidence. See Craig, 76 F.3d at 589 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." (internal quotation marks omitted)). Furthermore, the ALJ's conclusion that, during the relevant period, Plaintiff remained able to "regularly perform[] a number of household tasks, such as cleaning, cooking food, wash[ing] clothes, and . . . shopping" (Tr. 32) constitutes a fair synthesis of the varying evidence on the subject. Under such circumstances, the Court should not "undertake to reweigh [the] conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]," Craig, 76 F.3d at 589.[9] Moreover, as the above-quoted language makes clear, the ALJ relied on more than Plaintiff's ADLs to find her statements not entirely consistent with the record evidence. (See Tr. 32.)

Simply put, the ALJ did not err in her analysis of Plaintiff's daily activities and supported the evaluation of Plaintiff's subjective symptom reporting with substantial evidence.

---

[9] Plaintiff does not point to any testimony or evidence to refute the ALJ's statement that "the 'help' th[e] older man [with whom Plaintiff resided] provided was largely financial, and that in return she provided some household assistance, which . . . was primarily cooking" (Tr. 32). (See Docket Entry 13 at 17-18.)

### III.  CONCLUSION

Plaintiff has not established any errors warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 15) be granted, and that this action be dismissed with prejudice.


                                        _____/s/ L. Patrick Auld_____
                                             **L. Patrick Auld**
                          **United States Magistrate Judge**

April 7, 2020